IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**CHRISTOPHER BRYAN SMITH,**

**Plaintiff,**

v.  CIVIL ACTION NO. 2:22-cv-00005

**JOE HOLLAND CHEVROLET, INC.,**

**Defendant.**

## COMPLAINT

Plaintiff, Mr. Christopher Bryan Smith, brings this action as a result of Defendant's unlawful and discriminatory employment practices. Mr. Smith was refused reasonable accommodation at work, and was ultimately terminated, as a result of his status as a person with disabilities in violation of W. Va. Code § 5-11-9(1)-(7). Further, on information and belief Mr. Smith was entitled to the protections of 29 U.S.C. § 2614, of which Defendant unlawfully denied him. As a result of these unlawful employment practices, Mr. Smith suffered damages as described herein for which he now seeks redress.

### PARTIES, JURISDICTION, AND VENUE

1. Mr. Christopher Smith is a 51-year-old resident of Kanawha County, West Virginia.

2. Defendant is a corporation charted in West Virginia, with a principal office address of 210 MacCorkle Avenue, South Charleston, West Virginia 25303.

3. Jurisdiction of this matter is proper pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367(a), and 29 U.S.C. § 2617(a)(2).

4. Venue is proper pursuant to 1391(b)(1)-(2), as Defendant resides in this judicial district, and a substantial part of the events and omissions giving rise to this claim occurred in this judicial district.

## STATEMENT OF FACTS

5. Defendant operates a vehicle sales lot in South Charleston, West Virginia. Defendant advertises that they employ nearly 150 people.

6. Mr. Smith was first employed by Defendant in or about June 2009. From 2009 until approximately February 2013, Mr. Smith was employed by Defendants as a Sales Representative.

7. In 2013, Mr. Smith left his employment with the Defendant to take a new job.

8. Approximately six years later, in June 2019, Mr. Smith returned to Defendant and again was employed as a Sales Representative. In that position, Mr. Smith's primary role was to sell new and used automobiles to Defendant's customers.

### *Plaintiff is an Individual with a Disability*

9. Mr. Smith is an individual in recovery from a substance use disorder.

10. Mr. Smith receives medication-assisted treatment through a DHHR-approved recovery program.

11. Beginning in August, 2018, Mr. Smith has been prescribed Suboxone by a licensed physician for his condition and has taken that medication as prescribed. As such, he demonstrates a record of such impairment.

12. Substance use disorders and recovery therefrom substantially limit major life activities.

13. Defendant was aware of Mr. Smith's disability and regarded him as having such impairment.

### *Plaintiff is Rehired as a Sales Representative*

14. In or around June 2019, Mr. Smith applied for employment with the Defendant.

15. As a part of his application for employment, Mr. Smith was asked to participate in a pre-employment interview.

16. Mr. Smith disclosed his disability to the Defendant. After disclosing his disability, Mr. Smith was asked to participate in additional interviews, which departed from the Defendant's usual business practice.

17. During these additional interviews, Mr. Smith was questioned at great length and with intense scrutiny about his disability. The Defendant's President, Joseph B. Holland Jr., even told Mr. Smith that Mr. Holland does not believe in recovery programs, such as Narcotics Anonymous or Alcoholics Anonymous. Mr. Holland also wanted to know who his sponsor was at Celebrate Recovery and grew frustrated when Mr. Smith told him that sponsor identities are confidential.

18. Following the pre-employment interviews, Defendant requested a copy of Mr. Smith's medication-assisted treatment prescription.

19. After providing the Defendant with a copy of his prescription information, Mr. Smith was told by Joe Holland that before he received an offer of employment, Defendant needed to confirm that his hiring would not raise Defendant's insurance costs.

20. Defendant ultimately hired Mr. Smith, but Defendant's anti-recovery animus continued to exacerbate the employment relationship between the Parties.

21. Defendant engaged in a pattern of antagonistic conduct toward the Plaintiff throughout the following paragraphs.

### *Plaintiff's Employment with Defendant*

22. The essential function of Mr. Smith's employment was selling used and new automobiles to Defendant's customers.

23. Sales Representatives would make sales to customers who arrived at the dealership during their shift. When Sales Representatives made sales from in-person visits by customers, they were paid a commission based on the front half of the sale, an amount determined by the car's purchase price. Sales Representatives are also compensated for the back half of the sale and includes warranty, service contracts, and gap insurance.

24. Often times, one Sales Representatives would make the sale and be compensated for that part of the commission, but the customer would return another day, where a second Sales Representatives would earn the commission on the back half sales, including warranty, service contracts, and gap insurance.

25. In addition to in-person sales, Defendant would provide internet leads to Sales Representatives. These internet leads were generated when potential customers indicated an interest in purchasing a vehicle on Defendant's website.

26. When an internet lead came in, it would be assigned by the internet lead department ("the BDC"). Sales Representatives were told by management in team meetings and via policy that internet leads were assigned equally to each of the Sales Representatives.

27. When Sales Representatives were assigned an internet lead, the internet salesperson would walk to the Sales Representative in the showroom. As a result, Sales Representatives were

often aware when an internet lead had been assigned, even if they were not the employee to whom it was assigned.

28. On information and belief, Defendant received dozens of internet leads per month.

29. These internet leads constituted a significant portion of the Sales Representatives' sales volume.

30. Sales Representatives were expected to work five days per week. Sales Representatives were given Sunday off, as well as one of either Tuesday or Thursday. Mr. Smith worked from 8:30am-8pm each of those five days, or 57.5 hours per week.

31. Mr. Smith requested a reasonable accommodation permitting him to take Sunday and Wednesday off so as to allow him to continue visiting his doctor at their regularly scheduled appointment time on Wednesdays. Defendant permitted this accommodation.

32. The success of Sales Representatives was primarily measured by the number of sales that they completed. These numbers were displayed at weekly meetings. In addition, the manufacturer, Chevrolet, would also contact customers and conduct surveys. Mr. Smith received favorable reviews in these surveys.

33. Defendant had an established sales quota policy which required that Sales Representatives maintain a ninety-day rolling average of eight car sales per month. This quota encompasses both in-person and internet leads.

34. On information and belief, employees were not terminated as a matter of course for failure to meet Defendant's sales quota.

35. When he resumed his employment with Defendant in 2019, Mr. Smith began to realize that he was not being assigned internet leads at the same rate as other Sales Representatives.

36. Mr. Smith was given only two internet leads during a six-month period.

37. On information and belief, more than half of the business was generated on the internet, so this number is exceedingly low. Mr. Smith had, in his previous employment, received 4-6 internet leads per month.

38. Despite having significantly fewer leads provided to him by Defendant, Mr. Smith nevertheless consistently met the sales quota.

39. Between the beginning of his employment with Defendant in the summer of 2019 and November 2019, Mr. Smith was not reprimanded at work, told he needed to increase his sales, put on a performance improvement plan, or any other discipline.

40. To the contrary, Mr. Smith was rewarded for his performance with a demo vehicle in or around summer of 2019. Demo vehicles were complimentary vehicle leases of unsold vehicles, given as an incentive.

41. On or about Monday, December 16th, 2019, Mr. Smith went to get his haircut at The Refinery, a local business with a storefront beside Defendant's car lot, before work.

42. After trying the door, Mr. Smith realized the Refinery was closed, and walked to start his shift at work.

43. Mr. Smith saw an agent of Defendant while he was trying to open the door to The Refinery.

44. The following day, Mr. Smith was called into a meeting with the President of Defendant, Mr. Joe Holland.

45. Mr. Holland told Mr. Smith, "I'm worried about you. Someone saw you going into the drug apartments."

46. Mr. Smith tried to explain that he was only trying to get a haircut, but Defendant's agents continued to question him regarding his disability and sobriety, bringing up the "drug apartments" repeatedly.

### *Plaintiff Begins Suffering Medical Issues*

47. In or around December 2019, Mr. Smith's bipolar affective disorder worsened, making it difficult for him to work.

48. Mr. Smith did not no-call/no-show. To the contrary, he called in to let the Defendant know he was missing work those days, and he told the Defendant why he missed the work upon return.

49. Mr. Smith was, at the time, taking medication for his bipolar affective disorder, including Lithium and Prozac. Mr. Smith was seeing his psychiatrist, Dr. McClelland.

Mr. Smith continues to take these medications and this doctor to this day.

50. As a result, Mr. Smith missed approximately six days of work in December 2019.

51. Mr. Smith was fired Friday, January 3rd.

### COUNT ONE - Disparate Treatment
### West Virginia Human Rights Act W. Va. Code § 5-11-9(1)

52. The preceding paragraphs are incorporated by reference.

53. The West Virginia Human Rights Act declares it an unlawful discriminatory practice "[f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions, or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or disabled..." W. Va. Code § 5-11-9(1).

54. Within the context of the Human Rights Act, the term discriminate "…means to exclude from, or fail or refuse to extend to, a person equal opportunities because of race, religion, color, national origin, ancestry, age, blindness, handicap, or familial status and includes to separate or segregate." W. Va. Code § 5-11-3(h).

55. Under the West Virginia Human Rights Act a disability exists when an individual has "(1) [a] mental or physical impairment which substantially limits one or more of such person's major life activities… (2) [a] record of such impairment; or (3) [is] regarded as having such an impairment." W. Va. Code § 5-11-3(m).

56. Plaintiff was and remains capable of performing the essential functions of the job from which he was terminated by Defendant, and Plaintiff has mental and physical impairments which substantially limit his major life activities. Therefore, Plaintiff is a qualified individual with a disability as defined by the West Virginia Human Rights Act.

57. Defendant's decision to terminate Plaintiff was made on the basis of his status as a qualified individual with a disability in violation of the West Virginia Human Rights Act.

58. As a direct and proximate result of Defendant's unlawful, discriminatory decision to terminate Plaintiff, Plaintiff has lost wages and/or benefits in an amount to be proven at trial.

59. As a direct and proximate result of Defendant's unlawful, discriminatory decision to terminate Plaintiff, Plaintiff has suffered indignity, embarrassment, humiliation, and emotional distress entitling him to damages in an amount to be determined by the jury.

60. As a direct and proximate result of Defendant's unlawful, discriminatory decision to terminate Plaintiff, Plaintiff has incurred other damages, including but not limited to attorneys' fees and costs, which he is entitled to recover from Defendant.

61. In violating these established legal protections, Defendant acted with malice or reckless indifference to Plaintiff's rights, and acted willfully, knowingly, intentionally, oppressively, and/or wantonly to their civil obligations and Plaintiff's statutorily protected rights, thereby justifying an award of punitive damages.

### COUNT TWO- Failure to Accommodate
### West Virginia Human Rights Act, W. Va. Code § 5-11-1 *et seq.*

62.. The preceding paragraphs are incorporated by reference.

63. Defendant was aware that Plaintiff was a qualified individual with a disability.

64. Throughout his employment with Defendant, Plaintiff repeatedly requested, and required, reasonable accommodation to perform his job duties.

65. Defendant failed to provide Plaintiff with the reasonable accommodation of time off to attend recovery treatment, required as a result of his disability.

66. The failure Defendant to accommodate Plaintiff, viewed within the full context of the discrimination regularly faced by Plaintiff during the course of his employment, establishes Defendant acted with malice and reckless indifference to Plaintiff's statutorily protected rights.

### COUNT THREE - Unlawful Employment Practices
### Family Medical Leave Act 29 U.S.C. § 2611 et seq.

67. The preceding paragraphs are incorporated by reference.

68. At all relevant times, Defendant has been an employer covered by the Family Medical Leave Act. 29 U.S.C. § 2611(4).

69. During the course of his employment, Plaintiff became entitled to take leave as permitted by the FMLA. 29 U.S.C. § 2611(2).

70. Defendant did not permit Plaintiff to use FMLA leave, and engaged in prohibited conduct by retaliating against Plaintiff after he required FMLA qualifying leave. 29 U.S.C. § 2615(a).

71. Defendant's actions were intentional, with deliberate disregard for Plaintiff's statutorily protected rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

I. Actual damages suffered by the Plaintiff including, but not limited to, lost wages, lost benefits, and damages for emotional distress;

II. Punitive damages as permitted by law;

III. Costs incurred by the Plaintiff, including attorney's fees as permitted by law; and

IV. All other relief which this Court deems equitable, just, and proper.

**PLAINTIFF REQUESTS A JURY TRIAL ON ISSUES TRIABLE BY JURY**

Respectfully submitted,

Chris Smith, by counsel

*/s/ Brendan Wood*
Brendan M. Wood (WVSB # 13713)
Counsel for the Plaintiff
Legal Aid of West Virginia
922 Quarrier Street, 4th Floor
Charleston, West Virginia 25301
(304) 343-3013 ext. 2185 (phone)
(304 345-5934 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**CHRISTOPHER BRYAN SMITH,**

    Plaintiff,

v.                                CIVIL ACTION NO. _____

**JOE HOLLAND CHEVROLET, INC.,**

    Defendant.

## CERTIFICATE OF SERVICE

    I, Brendan Wood, counsel for Christopher B. Smith, above-styled Plaintiff, note that the above-styled Defendant, Joe Holland Chevrolet, Inc., was served Plaintiff's Complaint on January 3, 2022 via certified mail at 210 MacCorkle Avenue, South Charleston, WV 25303.

                                                Respectfully,
                                                Chris Smith
                                                By Counsel,

*/s/ Brendan Wood*
_____
Brendan M. Wood (WVSB # 13713)
Counsel for the Plaintiff
Legal Aid of West Virginia
922 Quarrier Street, 4th Floor
Charleston, West Virginia 25301
(304) 343-3013 ext. 2185 (phone)
(304 345-5934 (fax)